FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
(Alexandria Division)

2014 APR 22  P 2: 43

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

|  |  |
|---|---|
| JAMES J. MULVEY, M.D.<br>102 Spanish Point Road<br>Ocean Springs, Mississippi 39564<br><br>        Plaintiff,<br><br>        v.<br><br>COMPREHENSIVE HEALTH<br>  SERVICES, INC.<br>10701 Parkridge Boulevard, Suite 200<br>Reston, Virginia 20191<br><br>Serve:  CT Corporation System<br>          4701 Cox Road, Suite 285<br>          Glen Allen, Virginia 23060<br><br>and<br><br>CHS MIDDLE EAST, LLC<br>10701 Parkridge Boulevard, Suite 200<br>Reston, Virginia 20191<br><br>Serve:  CT Corporation System<br>          4701 Cox Road, Suite 285<br>          Glen Allen, Virginia 23060<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No. _1:14CV441_<br>                _LO/JFA_ |

**COMPLAINT**

PLAINTIFF JAMES J. MULVEY, M.D., by counsel, moves this Court for entry of judgment in his favor, and against the Defendants, COMPREHENSIVE HEALTH SERVICES, INC., and CHS MIDDLE EAST, LLC and in support of such complaint alleges and avers as follows:

## NATURE OF ACTION

1.      This is a civil action alleging retaliation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1) ("Title VII").

## PARTIES

2.      Plaintiff James J. Mulvey, M.D. ("Dr. Mulvey") is a resident and citizen of Jackson County in the State of Mississippi.   At all times relevant hereto, Dr. Mulvey was employed by Comprehensive Health Services, Inc.

3.      Defendant Comprehensive Health Services, Inc. ("CHS") is a Maryland corporation registered to do business, and in good standing, in the Commonwealth of Virginia, and which maintains an office in the Eastern District of Virginia.

4.      Defendant CHS Middle East, LLC ("CHS Middle") is a Maryland limited liability corporation registered to do business, and in good standing, in the Commonwealth of Virginia, and which maintains an office in the Eastern District of Virginia.   On information and belief, CHS Middle is a subsidiary of CHS.

## JURISDICTION

5.      This Court has jurisdiction over Plaintiff's claims under 28 U.S.C. §§ 1331 and 1343(a)(4) and 42 U.S.C. § 2000e-5(f)(3).

6.      The amount in controversy exceeds the jurisdictional minimum for this Court.

7.      CHS and CHS Middle (collectively, "Defendants") are present in and regularly conduct business in the Eastern District of Virginia.

8.      The torts at issue occurred in the Eastern District of Virginia.

9.      CHS and CHS Middle are subject to the personal jurisdiction of this Court.

## VENUE

10.     CHS and CHS Middle are present in and regularly conducts affairs and business activities in this judicial district.

11.     The causes of action alleged in this action arose in this judicial district.

12.     The unlawful employment practices committed by CHS and CHS Middle occurred in this judicial district.

13.     Venue over Plaintiff's claims is proper in this Court pursuant to 42 U.S.C. § 2000e-5(f)(3), 28 U.S.C. § 1331, 1332, and 1343(a)(4).

## PROCEDURAL STATUS

14.     Dr. Mulvey timely filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on September 23, 2012.

15.     On December 23, 2013, the EEOC issued Dr. Mulvey a Right to Sue letter.

16.     This action is timely filed and all procedural prerequisites to suit have been met.

## BACKGROUND

17.     Dr. Mulvey began working for Defendants in October 2011 as the Chief Medical Officer/Deputy Program Manager for a Department of State contract to provide medical support services to all personnel in Iraq.

18.     Dr. Mulvey worked for Defendants in Baghdad, Iraq.

19.     At all times relevant hereto, Dr. Mulvey's immediate supervisor was Casper Jones ("Mr. Jones"), the Program Manager for Defendants' Iraq contract.   The Deputy Program Manager for Defendants' Iraq contract was Tom Nagle ("Mr. Nagle").

20.     Dr. Mulvey performed his job in an exemplary manner.   When Defendants were awarded a lucrative Department of State contract to conduct the Public Health and Safety

3

Inspections for Iraq around April 2012, Dr. Mulvey assumed the lead role as Interim Program Director in implementing this contract. He has a Masters in Public Health and was the most qualified person for Defendants in Iraq to assume leadership for this contract. He recruited Public Health Technicians, travelled on site visits across Iraq, and trained Defendants' personnel to successfully initiate the contract.

21.     Michael Breslin ("Mr. Breslin") was the Iraq MSSI Business Manager at CHS.

22.     Mr. Breslin sexually harassed Dr. Mulvey. In particular, in May and June of 2012, on two separate occasions, Mr. Breslin placed his scrotum on Dr. Mulvey's desk and asked if, "his balls look like brains." During the same time period, Mr. Breslin placed several tampons with ketchup on Dr. Mulvey's desk. In addition, Mr. Breslin would frequently attempt to discuss pornography and other inappropriate sexual topics in the workplace with Dr. Mulvey.

23.     On or around August 14, 2012, Dr. Mulvey advised Mr. Jones that Mr. Breslin had been sexually harassing him.

24.     Mr. Jones spoke to Mr. Breslin and confirmed the validity of Dr. Mulvey's allegations regarding the specific sexual harassment incidents.

25.     Mr. Jones emailed Dr. Mulvey to tell him that he had spoken with Mr. Breslin and that Mr. Breslin had assured him that the harassment would not happen again. This was Mr. Jones's only follow-up communication with Dr. Mulvey regarding Dr. Mulvey's sexual harassment complaints.

26.     It appeared to Dr. Mulvey that Mr. Jones wanted to suppress the incidents and not notify Human Resources about the sexual harassment.

27.     On August 14, 2012, Dr. Mulvey notified Edie Freeman ("Ms. Freeman"), the Senior Human Resources Director, of Mr. Breslin's sexual harassment.

28.     As a result of Dr. Mulvey's complaint, Human Resources ("HR") initiated an investigation into Mr. Breslin's sexual harassment of Dr. Mulvey.

29.     Later, Mr. Jones whispered to Dr. Mulvey in the dining hall that "Breslin has resigned." This was the only follow-up information that Dr. Mulvey received in response to the sexual harassment complaint he made to HR.

30.     After Dr. Mulvey complained about Mr. Breslin's sexual harassment of him, Mr. Jones harassed him and compartmentalized and criticized his work.

31.     A few months earlier, Seth Cohen ("Mr. Cohen"), the MD-DOS Middle East MO to CHS from the U.S. Department of State, had requested that Defendants conduct an audit of their medical charts because a chart was found to not have a required progress note referencing a prescription.

32.     At all times relevant, Defendants did not have an established chart review protocol.

33.     Defendants conducted a chart audit, per the Department of State's request. This audit continued through September 2012. Mr. Nagle assigned the chart audit to Ted Snyder ("Mr. Snyder") for oversight. Mr. Nagle stated, "no matter what the audit shows Mulvey is out of here. Gone." Indeed, Mr. Snyder characterized the audit as a "witch hunt."

34.     As part of this audit, all of Dr. Mulvey's provider charts were scrutinized for the time period June 2012 – September 2012.

35.     This type of chart audit was not common practice at CHS, and only the charts of Dr. Mulvey and one other doctor were targeted for review in this investigation.

36.     The investigation's initial review found an alleged 14 prescriptions issued by Dr. Mulvey that lacked proper documentation and an alleged 47 (out of 67 total) medical charts by Dr. Mulvey that were missing documentation.

37.     Based on these findings from the investigation's initial review, Mr. Nagle called Dr. Mulvey to his office on September 19, 2012, per Mr. Jones's instruction, and notified Dr. Mulvey that he was being suspended from clinical practice and removed from his position as Chief Medical Officer and BDSC Site Lead pending the official results of the investigation.

38.     While going through the charts to determine the validity of the allegations against Dr. Mulvey, Mr. Synder told Dr. Mulvey, "I have been told to watch you to make sure you don't alter any of the charts." Within two hours of working to review the charts, Dr. Mulvey and Mr. Synder were able to account for documentation for 13 of the 14 prescriptions at issue.

39.     The only prescription for which they were unable to locate the required documentation was one for an HR employee Dr. Mulvey knew personally. This HR employee later told Dr. Mulvey that he knew that Dr. Mulvey had generated a chart on him because Dr. Mulvey had sent him to the Emergency Room to register, and that he thought that they had been unable to find his chart because his first name is actually Daniel (although he is known as Phil).

40.     Dr. Mulvey and Mr. Synder gave Mr. Jones their findings from their review of the prescriptions.

41.     Dr. Mulvey then met with Mr. Jones to discuss the findings and explain that documentation had been located for all but one of the prescriptions at issue. Mr. Jones told Dr. Mulvey that his suspension was lifted but that he would not be reinstated as the Chief Medical Officer and BDSC Site Lead. Mr. Jones claimed that Dr. Mulvey had lost his position as the

Chief Medical Officer and BDSC Site Lead because of his "leadership." Mr. Jones did not give any further explanation for the reason behind Dr. Mulvey's loss of his positions.

42.    Mr. Jones's comment about Dr. Mulvey's "leadership" supposedly being a problem was unexpected because Dr. Mulvey had never previously received any negative feedback regarding his leadership.

43.    Dr. Mulvey also reviewed the 47 charts that were alleged to have missing documentation. He determined that a total of six charts lacked a progress note and one chart lacked a splint note. The other 40 charts were either not scanned properly or at all into the appropriate system, were for patients who had seen another provider, or were for Guard Force physicals, outpatient labs, or medications for which an ER provider note was not required. Therefore, 40 of the allegedly problematic charts did not actually require any additional documentation, and only seven charts did require additional notes.

44.    On September 20, 2012, Dr. Mulvey entered the required additional documentation for those remaining seven charts into the appropriate records program.

45.    Dr. Mulvey met with Mr. Jones, Mr. Tamblyn, and Thomas Rylander ("Mr. Rylander"), the Business Manager, on September 23, 2012 to discuss his findings regarding the charts and to request reinstatement to his position as Chief Medical Officer and BDSC Site Lead.

46.    Mr. Jones made various allegations about Dr. Mulvey during this meeting. In particular, despite the evidence presented by Dr. Mulvey, Mr. Jones persisted with his allegations that Dr. Mulvey violated the prescriber/patient rule by not accounting for documentation of prescriptions.

47.    Mr. Jones had clearly been given misinformation from William Ackerman ("Mr. Ackerman"), the Iraq Logistics Manager, Mr. Breslin, and Mr. Nagle. Dr. Mulvey answered Mr. Jones's allegations and was able to refute each allegation.

48.    However, despite Dr. Mulvey's explanations of the facts regarding this issue, and the fact that Dr. Mulvey demonstrated that most of his prescriptions and charts were not actually lacking necessary documentation, Mr. Jones refused to reinstate Dr. Mulvey to his position as Chief Medical Officer.

49.    Instead, Mr. Jones offered Dr. Mulvey a position as an ER Provider (a demotion), with a base salary of $40,000 less per year.

50.    Dr. Mulvey refused to accept the offered demotion. Dr. Mulvey told Mr. Jones that this demotion was in retaliation based on Dr. Mulvey's sexual harassment complaint.

51.    After Dr. Mulvey refused to accept the demotion, Mr. Tamblyn and Mr. Jones terminated Dr. Mulvey's employment with CHS.

52.    One of Dr. Mulvey's coworkers, Dr. Karl Hagen ("Dr. Hagen"), was treated very differently than Dr. Mulvey during this chart audit. Dr. Hagen's prescriptions were also selected for review in this audit. The audit found that Dr. Hagen had six controlled substance prescriptions lacking proper documentation. Per Dr. Hagen's request, Dr. Mulvey assisted him in determining how to provide the appropriate documentation. Mr. Nagle then allowed Dr. Hagen to write handwritten notes to go in the files to provide the documentation that was lacking.

53.    Even though Dr. Hagen was found to have six controlled substance deficiencies and Dr. Mulvey was found to only have one prescription which required additional documentation, Dr. Hagen was allowed to generate progress notes to cover his six controlled

substance deficiencies and was not disciplined in any way, while Dr. Mulvey was sanctioned, suspended, and removed from his position as Chief Medical Officer and BDSC Site Lead.

54.     Dr. Mulvey was clearly treated differently and worse than Dr. Hagen by CHS during this chart audit, even though Dr. Mulvey was found to have fewer controlled substance prescription deficiencies than Dr. Hagen. Dr. Mulvey, unlike Dr. Hagen, had complained to HR about being sexually harassed. Dr. Mulvey's disparate treatment was in retaliation for his complaints of sexual harassment.

55.     After Dr. Mulvey's complaint about Mr. Breslin's sexual harassment (which led to Mr. Breslin's resignation), Phil Tamblyn, a CHS HR representative, told Mr. Synder, "I told my wife before I left that if nothing else I do in Iraq I will get Mulvey fired for what he did to Breslin." Mr. Tamblyn and Mr. Breslin are good friends.

56.     In addition, when Mr. Nagle assigned the chart audit to Mr. Synder for oversight, Mr. Nagle stated to Mr. Synder, "No matter what the audit shows, Mulvey is out of here, gone."

57.     As further evidence of Mr. Jones' bias against Dr. Mulvey, Mr. Jones attempted to falsely accuse Dr. Mulvey of making a sexist comment about another employee. Around mid-August, Mr. Jones accused Dr. Mulvey of making a sexist comment about a female employee, despite the fact that Mr. Jones had previously been told by another employee that the woman had said that a different doctor than Dr. Mulvey had made the comment.

58.     In May 2012, Mr. Jones agreed to increase Dr. Mulvey's base salary from $284,000 to $324,000 due to Dr. Mulvey's performance. In July 2012, Mr. Breslin confirmed to Dr. Mulvey that Dr. Mulvey was scheduled to receive this salary increase when he returned to Iraq from vacation. However, after Dr. Mulvey complained about Mr. Breslin's sexual harassment in August 2012, he never received the promised salary increase. Dr. Mulvey

calculates that he lost almost $165,000 from his early termination from CHS, plus tax benefits from working overseas for the year and other expenses incurred.

## COUNT ONE –

## RETALIATION UNDER TITLE VII
### (against Defendants)

59.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

60.     Defendants retaliated against Dr. Mulvey over his complaints of sexual harassment (as described above) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

61.     After Dr. Mulvey complained about sexual harassment, he was suspended, removed from his position, offered a demotion and salary decrease, and ultimately terminated.

62.     In addition, Defendants treated Dr. Mulvey differently from Dr. Hagen, the other doctor who was involved in the chart audit.  In particular, Dr. Hagan was permitted to generate retroactive progress notes and was not disciplined for any of the deficiencies in his charts. Conversely, Dr. Mulvey was subjected to the adverse employment actions set forth above.

63.     Defendants' discriminatory treatment of Dr. Mulvey violated Title VII of the federal Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1).

64.     In discriminating against Dr. Mulvey in violation of federal law, Defendants evidenced malice, spite, and ill will; its actions were willful and wanton; and evinced a conscious disregard for the rights of Dr. Mulvey.

65.     As a direct and proximate result of Defendants' actions, Dr. Mulvey has suffered and continues to suffer injury, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, medical expenses, other past pecuniary

losses, future pecuniary losses, and other nonpecuniary losses. Dr. Mulvey received counseling sessions with the on-site psychologists due to the stress he was experiencing after he complained about Mr. Breslin's sexual harassment of him.

66.     Due to the conscious disregard for Dr. Mulvey's federally protected rights, and the severity of Defendants' conduct, Dr. Mulvey is also entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff JAMES J. MULVEY, M.D. requests that this Court enter judgment in his favor and against Defendants, COMPREHENSIVE HEALTH SERVICES, INC. and CHS MIDDLE EAST, LLC, on the above Count One, and on each of them, and further:

a)  Award Dr. Mulvey compensatory damages in amounts to be determined by a jury, including demonstrated past and future pecuniary damages and emotional distress damages on Count One ; and in addition

b)  Award Dr. Mulvey punitive and exemplary damages, to be determined by a jury, and in any event to be restricted by the statutory cap of $350,000.00 on Count One; and in addition

c)  Award Dr. Mulvey appropriate front pay and back pay, including all lost income and benefits of employment both past and future; and in addition

d)  Award Dr. Mulvey his attorneys' fees and costs in this action as permitted by law, including costs and fees of expert witnesses; and in addition

e)  Award Dr. Mulvey appropriate pre-judgment and post-judgment interest; and in addition

f)  Award Dr. Mulvey such other and further relief as may be appropriate and permitted by law.

## JURY DEMAND

**PLAINTIFF JAMES J. MULVEY, M.D. DEMANDS A TRIAL BY JURY.**


April 22, 2014                                    Respectfully submitted,


                                                  Peter C. Cohen
                                                  Virginia Bar No. 66346
                                                  pcohen@cbcblaw.com
                                                  Brian A. Scotti
                                                  Virginia Bar No. 74510
                                                  bscotti@cbcblaw.com
                                                  CHARLSON BREDEHOFT COHEN
                                                    & BROWN, P.C.
                                                  11260 Roger Bacon Drive, Suite 201
                                                  Reston, Virginia 20190
                                                  (703) 318-6800 Telephone
                                                  (703) 318-6808 Facsimile

                                                  *Counsel for Plaintiff,*
                                                    *James J. Mulvey, M.D.*